# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00069-CR

---

**Freddy Uceta, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 75816, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Freddy Uceta of the second-degree felony offense of aggravated assault with a deadly weapon, a razor blade. *See* Tex. Penal Code § 22.02(a)(2). After finding an enhancement paragraph to be true, the jury assessed punishment at sixty-five years' imprisonment. *See id.* §§ 12.32(a), .33(a). The district court rendered judgment on the verdict. On appeal, Uceta contends that the district court erred by refusing his requested jury instruction on self-defense, that there was insufficient evidence that he used a deadly weapon, and that his custodial statement made without *Miranda* warnings should have been excluded. We will affirm the district court's judgment of conviction.

## BACKGROUND

Uceta's aggravated-assault charge stemmed from his attack on Detrick Dortch when they were both inmates at the Bell County Jail.[1] Jail guard David Guerra testified that on the night of the offense, he was preparing to place inmates in their cells before "lights out" and allowing them to use the restroom in the dorm area. Dortch was alone at a urinal in the restroom and stood facing the wall. Uceta approached Guerra and said that he needed to use the restroom. When Uceta went into the restroom, Guerra heard no words exchanged between the inmates but saw Uceta walk up behind Dortch and begin "hitting" his back and the back of his head. Guerra attempted to separate the inmates and to "peel [Uceta] off of" Dortch, but Uceta "continued to strike" Dortch as "his arms were flailing around." Guerra testified that Uceta "didn't look like he was holding back" or showing "any restraint" during the assault. When the inmates were eventually separated, Guerra placed Uceta in hand restraints.

Events leading to the restroom attack were captured on a jail video that was admitted into evidence without objection. The video shows Uceta dancing in a common area outside the restroom, speaking to a jail guard, and then entering the restroom less than a minute after Dortch did. A portion of the restroom's interior is visible through the open restroom door. Jail staff rush into the restroom shortly after Uceta enters it, and through the doorway they are seen trying to remove Uceta from Dortch. Later, jail staff escort Dortch and Uceta separately from the restroom.

Corporal Eddie Booth arrived at the scene as Dortch was being led out of the restroom. He saw that Dortch sustained injuries to his back, torso, and both sides of his face and

---

[1] Uceta was jailed pending trial for an unrelated offense, for which he was convicted. *See Uceta v. State*, No. 03-18-00506-CR, 2019 Tex. App. LEXIS 9640, at *15 (Tex. App.—Austin Nov. 5, 2019, pet. ref'd) (mem. op., not designated for publication).

2

was "bleeding profusely." Corporal Booth noticed that those injuries "didn't look like they had come from a fight" with fists but "looked more like he had been sliced with a knife, or razor blade." Uceta did not have any visible injuries. Photographs of Dortch's injuries were admitted into evidence and showed that Dortch had a cut on his face going from his right ear to within an inch of his eye; another cut on his shoulder that continued horizontally across his arm; and three cuts on his back ranging from about three and a half to sixteen inches long, with one cut that went from his back up to his neck. Corporal Booth testified that the cuts to Dortch's back were "the most severe" in "length and depth" and that those injuries, if inflicted on his throat, could have caused serious bodily injury or death. He also testified that the injury near Dortch's eye if it continued into his eye, could have blinded him.

A jail nurse treated Dortch's injuries by cleaning the wounds, using pressure to stop the bleeding, and applying "glue or Steri-strips" instead of stitches or sutures to close the wound that went from Dortch's ear to his eye. She stated that the cuts on Dortch's back "were superficial but the ones on the face area looked deeper." She opined that a wound to the eye could have caused a loss of the eye and that a wound to the throat from a razor blade would have presented a risk of serious bodily injury or death.

Uceta "didn't seem fearful" at any time, according to Corporal Booth, and Uceta gave no explanation to him for the attack on Dortch. Corporal Booth searched Uceta for a weapon, and Uceta produced a razor blade from his mouth. The blade came from one of the razors provided to inmates for shaving, and it had not been returned as required. Corporal Booth stated that when removed from the razor, the blade is "flimsy" and "there's no way to put . . . extreme amount of force behind it." He also stated that Dortch's injuries "weren't deep enough to be . . . fatal," they were "superficial injuries" that did not require hospitalization. Corporal

3

Booth agreed with defense counsel's suggestion that "the flimsiness of the blade ke[pt] that from being serious injuries[.]" He testified that if the blade were on a dangerous spot on the body—like the throat, wrists, or eyes—it could have penetrated enough to damage important organs or body parts.

After the attack, as Uceta was being placed into a holding cell, Corporal Booth heard Uceta chanting loudly, "I'm a cut, cut, cutter." Uceta's chant was not in response to any question. Corporal Booth testified that the incident between Uceta and Dortch resulted in a disciplinary proceeding at the jail. As part of that proceeding, the disciplinary board held a hearing. Corporal Booth stated that the purpose of a disciplinary hearing is to assess punishment for a rule violation. When Corporal Booth served Uceta with notice of the disciplinary action against him, Uceta "kept on saying" that "he was a cold-blooded killer." Corporal Booth testified that Uceta's statement was not in response to any questioning and might have been made for other inmates to hear.

Shift Sergeant Michael Craft spoke with Uceta and Dortch about what happened. Outside the presence of the jury, Sergeant Craft testified that before speaking with Uceta, he did not provide *Miranda* warnings to him, request an attorney for him, or determine whether Uceta had an attorney. *See Miranda v. Arizona*, 384 U.S. 486, 479 (1966) (summarizing warnings). Sergeant Craft stated that advising an inmate of his rights is "[n]ot typical for an inmate disciplinary" proceeding and that "[n]obody on the in-house disciplinary is placed under arrest." Sergeant Craft noted that the nature of disciplinary hearings is administrative, rather than criminal, and that when he spoke with Uceta, Uceta "had no criminal charges as a result of this assault."

4

Sergeant Craft testified that he "was trained to speak to both parties" as part of the jail's regular procedure for infractions that are subject to administrative disciplinary proceedings. He explained that minor infractions result in reports, while fights or assaults result in a disciplinary hearing with notice of the hearing served to the inmate. Sergeant Craft spoke to Dortch in the infirmary, and Dortch told him that he and Uceta had a fight that the jail staff "did not see." Sergeant Craft then went to a holding cell and spoke with Uceta. Before asking him anything, he heard Uceta repeatedly chanting the words of a song, "I had to cut him." Sergeant Craft asked Uceta what happened, but Uceta only "continued to chant" while smiling, dancing, and "making hand gestures" like scissors cutting.

During trial, Dortch testified that he was "using the bathroom" and did not see Uceta before he attacked him. Dortch said nothing to Uceta at the time and did not swing at him or attack him. Dortch denied any memory of the assault and stated that his first recollection of that event was ending up in the shower area with a jail guard putting a sheet on his bleeding face. Dortch showed the jury the permanent scars on his face and shoulder resulting from Uceta's attack. Additionally, Dortch testified that he sustained a cut to his right eye—which the nurse did not notice when treating his other injuries—that he has difficulty seeing out of that eye, and that he requires glasses because of his eye injury. He acknowledged that he and Uceta were involved in a "physical confrontation" that occurred "weeks" before this incident, but Dortch had not seen or had any contact with Uceta during those intervening weeks.

Uceta testified at trial that he assaulted Dortch with a razor "out of anger because of a prior incident." Uceta said that he and Dortch had a fistfight in a jail cell four or five days before the restroom assault and that Dortch hit him while he was unconscious, which "dented" his face. Uceta stated that he discussed his sexuality openly and, "I was being bullied by Mr.

5

Dortch because I'm a homosexual." Uceta reported the bullying to jail staff but did not report the fistfight and did not ask to be moved. Uceta testified that before the assault, he found a razor blade in a book and kept it instead of turning it in.

On the night of the assault, Uceta retrieved the blade, hid it in his hand, and waited for Dortch to go into the restroom. Uceta said that while waiting for Dortch, he knew what he was going to do. He testified that when he saw Dortch, "I felt furious. I felt anger. I felt in fear of my life." But on cross-examination, Uceta testified that he planned to attack Dortch; that he was not worried that Dortch was going to turn around and come at him from the restroom; that Dortch did nothing while in the restroom to make Uceta think that Dortch was about to come after him; and that as he entered the restroom door, Dortch said nothing to him and made no threatening move toward him. Uceta acknowledged that he slashed at Dortch with the razor blade multiple times, that he swung at Dortch's back and face, and that he stopped swinging the razor blade at Dortch only because of the jail guards' intervention. Uceta also acknowledged that he was aware of jail-disciplinary procedures, that he could have reported what happened with Dortch previously, and that jail staff could have disciplined him.

A brief video of Uceta's hearing before the disciplinary board was admitted into evidence without objection. On the video, Uceta states that he is guilty of the assault, and then a board member asks Uceta whether there "was something that happened prior to this." Uceta replies, "No." He adds, "All I want to say is, you got what you deserved, p---y."

When the evidence closed, Uceta requested a jury instruction on self-defense, which the district court denied. Additionally, Uceta objected to the inclusion of a deadly weapon instruction, which the district court overruled. The jury found Uceta guilty of aggravated assault with a deadly weapon as charged. When the punishment phase concluded, the jury found an

6

enhancement paragraph true and assessed punishment at sixty-five years' imprisonment. The district court rendered judgment on the verdict. This appeal followed.

## DISCUSSION

**No entitlement to instruction on self-defense**

In his first issue, Uceta contends that the district court erred by refusing his requested jury instruction on self-defense. Our review of charge-error issues begins with a determination of whether error exists in the charge. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). "If error exists, we then analyze the harm resulting from the error" to determine whether reversal is required. *Id.* In determining harm, we apply separate standards of review depending on whether the charge error was preserved in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016) (citing procedure for review of charge-error complaints set forth in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). When, as here, the jury-charge complaint was preserved in the trial court, "reversal is required if there was some harm to the defendant." *Id.* at 843.

The Penal Code provides that "[t]he issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense." Tex. Penal Code § 2.03(a); *Kuhn v. State*, 393 S.W.3d 519, 532 (Tex. App.—Austin 2013, pet. ref'd). A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020); *see Celis v. State*, 416 S.W.3d 419, 430 (Tex. Crim. App. 2013) (noting that defendant is entitled to instruction on defensive issue that is raised by evidence, whether weak or strong, unimpeached or uncontradicted, and regardless of credibility of such defense to trial court). "The defendant bears the burden of showing that each element of the defense has been

7

satisfied." *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010). Accordingly, when the evidence viewed in the light most favorable to the defendant does not establish the defense, the defendant is not entitled to an instruction on the issue. *Kuhn*, 393 S.W.3d at 532.

When "determining whether a defense is supported by the evidence, 'a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven.'" *Id.* (quoting *Shaw*, 243 S.W.3d at 658). Requiring the evidence to "rationally support a jury finding before a defensive instruction is required serves to preserve the integrity of the jury as the factfinder by ensuring that it is instructed as to a defense only when, given the evidence, that defense is a rational alternative to the defendant's criminal liability." *Shaw*, 243 S.W.3d at 658. "If a jury were instructed as to a defense even though the evidence did not rationally support it, then the instruction would constitute an invitation to the jury to return a verdict based on speculation." *Id.* "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law." *Id.*

The Texas Penal Code sets forth the elements of self-defense, providing that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is *immediately* necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code § 9.31(a) (emphasis added). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(42). Thus, the Penal Code expressly requires some evidence of the defendant's reasonable belief that his use of force was immediately necessary to protect himself from another's use or attempted use of unlawful force. *See id.* §§ 1.07(a)(42),

8

9.31(a); *Alexander v. State*, No. 03-14-00290-CR, 2016 Tex. App. LEXIS 531, at *9 & n.11 (Tex. App.—Austin Jan. 21, 2016, pet. ref'd) (mem. op., not designated for publication).

Uceta contends that the evidence at trial and reasonable inferences from it "would have allowed a reasonable juror to conclude that Uceta was in fear of being beaten, if not killed by Dortch *if* Dortch's taunts and bullying escalated." (Emphasis added.) But to meet his burden of showing entitlement to a self-defense instruction, Uceta had to show some evidence that he reasonably believed his use of force was *immediately* necessary to protect himself against Dortch's use or attempted use of unlawful force. *See* Tex. Penal Code § 9.31(a) (emphasis added). The uncontroverted evidence was that Uceta planned to attack Dortch, that Dortch did nothing while in the restroom to make Uceta think that Dortch was about to come after him, and Dortch said nothing to Uceta and made no threatening move toward Uceta as Uceta entered the restroom door. Although Uceta testified that he felt "furious," "anger," and "in fear of [his] life" when he saw Dortch, no evidence indicated that Dortch used or attempted to use unlawful force against Uceta at the time of the assault, and Uceta testified that he was not worried about Dortch turning around and coming at him from the restroom. *Cf. id.*

Nothing in the record, viewed in the light most favorable to Uceta, would allow a reasonable factfinder to infer that he had a reasonable belief that his use of force against Dortch was "immediately necessary" to protect himself against any use or attempted use of unlawful force by Dortch. *See id.* §§ 1.07(a)(42), 9.31(a). Because Uceta failed to meet his burden of showing that every element of self-defense in subsection 9.31(a) was met, we cannot conclude that the district court erred by refusing Uceta's requested jury instruction on self-defense. *See id.* § 9.31(a); *Jordan*, 593 S.W.3d at 343; *Juarez*, 308 S.W.3d at 404; *Kuhn*, 393 S.W.3d at 532. We overrule Uceta's first issue.

9

**Sufficient evidence showing use of deadly weapon during assault**

In his second issue, Uceta challenges his conviction by contending that there was insufficient evidence that he used a "deadly weapon" during the commission of an assault. We determine whether there is sufficient evidence to support a conviction by considering the combined and cumulative force of all admitted evidence in the light most favorable to the verdict and deciding whether, based on that evidence and the reasonable inferences from it, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016). Proving a defendant's guilt beyond a reasonable doubt does not require disproving every conceivable alternative to his guilt. *Tate*, 500 S.W.3d at 413. Direct evidence and circumstantial evidence are equally probative in a sufficiency review. *Id.* As the sole judge of credibility and weight to be attached to the testimony of witnesses, the jury may draw multiple reasonable inferences from the facts so long as each is supported by the evidence presented at trial. *Jackson*, 443 U.S. at 326; *Tate*, 500 S.W.3d at 413. If the record supports conflicting inferences, we presume that the jury resolved those conflicts in favor of the verdict. *Jackson*, 443 U.S. at 326; *Tate*, 500 S.W.3d at 413.

The Penal Code states, in relevant part, that a person commits aggravated assault if he commits assault and uses or exhibits a deadly weapon during the commission of the assault. Tex. Penal Code § 22.02(a)(2). The Penal Code defines a deadly weapon as "(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17). The Penal Code defines "[s]erious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious

10

permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). The district court's charge tracked these statutes when defining the offense and the terms "deadly weapon" and "serious bodily injury" in the abstract portion of the charge. In the application paragraph, the court instructed the jury to find Uceta guilty of aggravated assault with a deadly weapon if it found from the evidence beyond a reasonable doubt that Uceta "did then and there intentionally, knowingly, or recklessly cause bodily injury to Detrick Dortch by cutting the said Detrick Dortch with a razor blade, and [Uceta] did then and there use or exhibit a deadly weapon, to-wit: a razor blade during the commission of said assault." *See id.* § 22.02(a)(2).

When determining whether a weapon is deadly in its manner of use or intended manner of use, we consider threatening actions by the defendant, including the defendant's proximity to the victim, the weapon's ability to inflict serious bodily injury or death, and the manner in which the defendant used the weapon. *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017). Although the nature of the inflicted wounds is a factor to be considered, "wounds are not a necessary prerequisite for an object to be a deadly weapon." *Dominique v. State*, 598 S.W.2d 285, 286 (Tex. Crim. App. 1980) (noting that "[t]he most important criteria was the manner in which the weapon was used"). Either expert testimony or lay testimony may be sufficient to support a deadly weapon finding. *English v. State*, 647 S.W.2d 667, 668-69 (Tex. Crim. App. 1983).

Here, Uceta notes that the razor he used to strike Dortch was small, that it was described as "flimsy" and incapable of bearing an "extreme amount of force behind it" and that the flimsiness of the blade kept the injuries from being serious ones. However, Uceta acknowledged that he slashed at Dortch with the razor blade multiple times, swinging at

11

Dortch's back and face. Uceta was close enough to inflict multiple cuts to Dortch as he stood at the urinal. There was evidence that Uceta used the razor blade to inflict injury that impaired Dortch's eyesight, and the jury saw the permanent scarring to Dortch's face and shoulder resulting from Uceta's use of the blade. Corporal Booth testified that the cuts to Dortch's back were "the most severe" in "length and depth" and that those injuries, if inflicted on his throat, could have caused serious bodily injury or death. A jail nurse stated that she applied "glue or Steri-strips" instead of stitches or sutures to close the wound that went from Dortch's ear to his eye. She opined that a wound to the eye could have caused a loss of the eye and that a wound to the throat by a razor blade would have presented a risk of serious bodily injury or death. The jury saw video evidence showing that jail guards intervened shortly after Uceta entered the restroom, and Uceta acknowledged that he stopped swinging the razor blade at Dortch only because of their intervention. Further, the razor blade itself was admitted into evidence, and the jury could observe its characteristics when assessing whether it was a deadly weapon.

We conclude that the evidence at trial, viewed in the light most favorable to the jury's verdict, is sufficient to support the jury's verdict that the razor blade was a deadly weapon because the manner of its use or intended use by Uceta was capable of causing death or serious bodily injury. *See Barnett v. State*, 344 S.W.3d 6, 13 (Tex. App.—Texarkana 2011, pet. ref'd) (concluding that pocketknife was deadly weapon); *see also Byrd v. State*, No. 04-08-00313-CR, 2009 Tex. App. LEXIS 4970, at *3 n.1, *11 (Tex. App.—San Antonio July 1, 2009, pet. ref'd) (mem. op., not designated for publication) (noting that deadly weapon used by inmate during assault was blade removed from State-issued disposable razor). We overrule Uceta's second issue.

12

**Admission of statement to Sergeant Craft was harmless**

In his third issue, Uceta contends that the district court erred by admitting his custodial statement to Sergeant Craft after the attack and while Uceta was in a holding cell. The court overruled Uceta's objection to Sergeant Craft's testimony that he asked Uceta what happened and Uceta said, "I had to cut." Uceta contends that he was in police custody when he made his statement to Sergeant Craft and that the statement was inadmissible because he had not been provided with *Miranda* warnings. *See Miranda*, 384 U.S. at 479. Uceta's complaint is based on this testimony from Sergeant Craft:

> Q And so in terms of this incident we're talking about you being in the beginning of the investigative stage when you go talk to Mr. Uceta?
>
> A Yes.
>
> Q And when you went to talk to him in the holding cell, what did you say to him?
>
> A I asked him, simply what happened. What did you see what happened, what was your side.
>
> Q All right. And what did he say to you?
>
> A He was kind of chanting the words of a song back and forth "I had to cut him."
>
> Q Were those the only words that you can remember him saying?
>
> A Yes.
>
> . . . .
> Q Did he—was there a period of time that he chanted this song?
>
> A From my recollection he was chanting the song even before I walked up to the cell.
>
> Q Okay. So when you asked him the question, he was already chanting the song?
>
> A Yes.

The evidence shows that Uceta was chanting a song, "I had to cut him," before Sergeant Craft ever asked him a question. But even if Uceta's statement to Sergeant Craft should have been excluded, its admission was harmless. Texas Rule of Appellate Procedure 44.2(a) provides that if there is constitutional error, the reviewing court must reverse the judgment of conviction unless the court determines "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). Here, the admission of Uceta's statement, "I had to cut"—which was the subject of his objection during trial—did not contribute to Uceta's conviction or punishment, particularly given the evidence that was previously presented to the jury showing that Uceta cut Dortch as charged in the indictment.

The day before the jury heard any testimony from Sergeant Craft about Uceta's statement, the jury saw the video showing Uceta dancing in a common area outside the restroom, speaking to a jail guard, entering the restroom less than a minute after Dortch, being separated from Dortch by jailers, and being escorted from the restroom. The jury heard jail guard Guerra testify that he saw Uceta walk up behind Dortch and appear to begin "hitting" Dortch's back and the back of his head. Corporal Booth noticed that Dortch's injuries "didn't look like they had come from a fight" with fists but "looked more like he had been sliced with a knife, or razor blade." After the attack, Uceta produced a razor from his mouth and gave it to Corporal Booth. As Uceta was being placed into a holding cell, Corporal Booth heard Uceta chanting loudly, unprompted by any question, "I'm a cut, cut, cutter."

Further, Uceta himself testified that he assaulted Dortch with a razor "out of anger because of a prior incident"; that he did not turn in the razor blade when he found it; that he waited for Dortch; and that he slashed at him with the razor blade multiple times, stopping only

14

because of the jail guards' intervention. The jury saw a second video from the disciplinary proceeding, in which Uceta stated, "All I want to say is, you got what you deserved."

Given the evidence presented to the jury during trial, we conclude beyond a reasonable doubt that even if there were any error in admitting Uceta's statement to Sergeant Craft that he "had to cut," such error did not contribute to Uceta's conviction or punishment. *See* Tex. R. App. P. 44.2(a). We overrule Uceta's third issue.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed: February 3, 2021

Do Not Publish